Your Honor, this case will adopt a 2-15-107-1822. And although these cases have been discussed, I bring them on behalf of the defendant appellant, Mr. Christopher M. McCoy. I bring them on behalf of the defendant's attorney, Mr. Christian M. Schrinner.  And we do have Exhibit 27 here if anybody wants to look at it. We've looked at it. May it please the Court. Counsel? My name is Christopher McCoy from the Office of the State Appellate Defender, and I represent Mr. Rinaldo Ramsey. Today there are two issues in this case. First, a reasonable doubt challenge to the home invasion conviction, and second, a counsel of choice argument. On the home invasion argument, we're not disputing that this was obviously a brutal attack. We're not contesting that this didn't amount to an aggravated battery. However, despite the violent nature of what occurred in this case, it didn't amount to a home invasion because the State failed to prove the unauthorized entry element beyond a reasonable doubt. And there's three reasons for that. First, the limited authority doctrine should not be applied in this appeal. Second, the defendant reaching his hand out of the back door did not constitute an exit and reentry. And finally, and perhaps most importantly, the laundry room was part of Mr. Stanley's dwelling place. The trial court made a finding that the defendant exited and came back in, correct? Yes. The trial court's – that's what the guilty finding was based on. The court said that Mr. Ramsey exited the building in its entirety. Now, that – the evidence didn't support that finding because all it showed – well, at most what it showed was the defendant sticking his hand out of the back exterior door, which is shown in that exhibit number 27. No one was present in the laundry room. No one saw what happened. And a testimony and a photograph show that these tools – I mean, they're called various things, the fire pokers. I'll just call them tools, but the tools were kept within arm's reach of that exterior door. So given that it's the State's burden of proof beyond a reasonable doubt, it's pure speculation to say that Mr. Ramsey did anything beyond sticking his arm out of that door. And then the question becomes, was that an exit and reentry? These terms aren't defined by statute, but common usage and common understanding would say no. A sort of related example would be some people have mailboxes that are on the front of their houses as opposed to being out on the street. If that mailbox was close enough to the front door that you could just stick your arm out, grab the mail, you wouldn't say that you exited and reentered the house. And the same thing applies here. So because of that, the fact that these tools are outside in and of itself doesn't amount – it doesn't create a second entry. Do you have any cases – did you find anything that comes close either here in the State of Illinois or outside that talks about when part of you goes out and comes back in? No, I didn't find any cases. We're just relying on, again, the common usage of those terms. So as I said, that's sort of the second issue I set out. The first one regarding the limited authority doctrine can actually be dispensed with fairly quickly. The state at trial argued the contrary position. They argued that Mr. Ramsey's initial entry into the dwelling place was authorized. So because they took a contrary position on appeal, it can't be considered. And even if it could be considered, there's no evidence – there's certainly no evidence beyond reasonable doubt of criminal intent at the time of entry. Mr. Ramsey went in there because he thought Mr. Stanley – Mr. Stanley's girlfriend owed him money, and certainly asking someone for money they owe you is not a crime. The confrontation then only became physical after Mr. Stanley pushed the defendant. And these are probably the reasons why the state didn't even raise this theory in the court below. So the initial entry was authorized. The fact that these tools are outside, that doesn't make there be a second entry. So what really is the heart of this case is was the laundry room part of the dwelling place? We acknowledge that Mr. Stanley could not use that laundry room to do laundry or for storage, but it still remained the only means he had to access his apartment. It's important to remember this isn't a major, huge, multi-unit apartment complex. This is just a normal house. Upstairs is one unit. Does that matter? If you have an apartment building, let's say a 20-unit building that has a door to go in, then there's a hallway and there's a number of different apartments. If someone would force their way into that hallway and attack someone, is that part of the dwelling? I think that would be a closer case than what we have here because the difference here is when there is only two people, when it is the laundry room leading directly into Mr. Stanley's kitchen, there's more interest. He has more authority over this. It doesn't lead directly into his kitchen. There's a door there that he locks, and that leads into his apartment, correct? There's a door there. I did not see any testimony that he locked that door or that that door could be locked. Well, I thought he went back after the first confrontation, he went back to lock that door, and lo and behold, the defendant comes out of that laundry room-ish door. There is a door in any case. There's a door. The fact is that the laundry room is directly adjacent to his kitchen with a door in the way. Obviously, when we're dealing with a smaller structure, there is more privacy. The victim would have more authority over that space. But even so, I think in your hypothetical, there still would be reasons to find that to be part of the dwelling place. If you go in your apartment, you go in the exterior door, the door locks behind you, there is a greater feeling of safety, of security, of authority to be able to tell people not to enter into that space. So even in that situation, there would be reasons to hold it to be part of the dwelling place. What about the language in Pettit that the Supreme Court basically seems to contradict what you're saying? Well, I don't think Pettit even addresses this argument. In Pettit, the question there was whether this constructive presence doctrine could be applied. And the fact is it's a very unusual case in how it was charged. It was charged with a home invasion of the second-floor apartment and not the first-floor apartment. And the concerns about sort of the common area really weren't raised in that case. Well, I guess I'm not talking about the holding of Pettit itself and the facts of that case, but the way Pettit dealt with Pavick. I mean, Pettit noted that Pavick, the Pavick court ruled that a basement, a common area of an apartment building was part of the victim's dwelling place. And the Supreme Court in Pettit said, we do not agree with this interpretation. If you read the facts of Pettit, the interpretation they're not agreeing with would seem to be the constructive presence. So in Pavick, there's two independent holdings. And what happens in that case is the victim's in her apartment. The power goes out. So she goes down to her basement, flips the circuit breaker back on, comes back up to her apartment. When she reenters her apartment, the defendant's already there and assaults her. So in Pavick, the appellate court held that that was a home invasion for two reasons. First, constructive presence, which is what gets overruled in Pettit. And second, because the basement is part of the dwelling place. So in Pettit, there's no issue about a basement. So there's no reason for them to ever consider that issue. And in fact, the only reason they're considering Pavick in Pettit is because the state in Pettit relied on Pavick to argue that this constructive presence doctrine was why that conviction should be affirmed. So there's two parts of the Pavick holding. Constructive presence gets overruled. The common basement portion, which is what we're relying on today, is still good law and was not overruled by Pettit. So should our holding today be that any enclosed common area of a multi-unit building is part of the dwelling place? I don't believe the court needs to go that far. I mean, every case is going to be different, and every case is going to have slightly different facts. Again, when you're dealing with a smaller unit and when you have just one small room that only two people can use between the exterior door and the victim's apartment, I think that— Well, how many units does it have to be before it becomes not a part of the dwelling? Well, I mean, I think— Yes, yes. So if we're talking about one building with two units, this is part of the dwelling. How about if there's three units? Again, the court doesn't have to consider that. I think there still is a good argument for the holding that you said, that anything enclosed that the victim would have to go through would constitute a dwelling place. And of course, it's just the facts change from case to case. I mean, this isn't—I mean, what if the laundry room is in the basement? The defendant—or excuse me, the victim would never even have to go into the laundry room. That's different here where, again, the laundry room is the only means for which the victim to access his apartment. And because of that, there's also the—you know, every case is just, as I said, going to have slightly different facts and different considerations. But even in the multi-unit apartment complex, there is still reasons to hold that it would be part of the dwelling place. And the law generally takes a very broad view of what a dwelling place is. It's a pretty expansive definition. There's obviously concerns for safety in the home, concerns about deterring unauthorized entries that would be served by holding that the laundry room was part of the dwelling place. And specifically here, Mr. Stanley referred to the exterior door as my back door. He could—he said he had authority to prevent people from coming into the laundry room. And there's testimony that this, again, was a locked—the exterior door was locked. So for all these reasons, it was—the purposes of the home invasion statute would be served by finding that the laundry room was part of the dwelling place. Unless there are further questions on that, to turn to the second issue regarding the counsel of choice argument. This case was pending for over three years, wasn't it? Correct. And how long does a court reasonably have to wait when the defendant continues to make these choices? Well, what the court needs to do and what the court didn't do here is to make an inquiry into the reasons for the defendant's motion. And that's really the heart of what the judge did wrong in this case. But he's been the judge throughout this case. It hasn't been in front of other judges, has it? I believe that at least in the initial stages, it was in front of other judges. I'm not sure that— All right. But for a period of time, maybe not the whole three years, but for a significant period of time, he has had a chance—it is a he— has had a chance to observe the defendant in court, see the changes, observe the defendant's posture and maybe posturing. And so why at this point does he need to ask additional questions when we've got witnesses out in the hall finally? Well, it's important to note that his holding wasn't based on the defendant's posture or any of the considerations you said. He said that whether it's a dilatory tactic or not, this motion is getting denied because it's the day of trial and there's a witness that's here. And, I mean, his consideration—the judge's considerations are the conveniences to the witness, which just frankly doesn't trump the defendant's constitutional right. And it's important to recognize that's what we're dealing with. We're not just dealing with a normal continuance. We're dealing with the defendant's constitutional right to counsel of choice, which—the improper deprivation of which constitutes structural error. And this right is so important that it trumps convenience to the parties, convenience to witnesses, unless it's being used as a dilatory tactic. And that was the key consideration that the trial judge just simply ignored in this case. And, in fact, so when the judge does deny the motion initially, he cites those two factors, that it's the day of trial and there's a witness here. Those same two factors were cited by the trial judge in Peeble v. Adams, and the appellate court there felt that the trial court abused its discretion because it didn't make the inquiry, which is the same problem that occurred in this case, and really Adams controls the outcome here. And this wasn't even really the day of trial. It was the day after the day of trial because he didn't show up with a new attorney or mention a new attorney on the day that it was originally set for trial for jury trial. He waived jury, shows up the next day for the bench trial, and then says, guess what? I want to hire a new attorney. That is correct. I would disagree that that's not the first day of trial. Months beforehand, they knew that they were not going to call any witnesses on that day. They knew that trial wasn't going to start. And so once he waived jury trial, there's nothing to do that day. And, in fact, if you look at sort of double jeopardy cases, jurisdiction or jeopardy doesn't attach to a bench trial until the first witness is called. So this trial hasn't started. Yes, he didn't say anything the day before. But we don't know what caused him to make this complaint at that time. The judge didn't ask him, why are you unhappy with your public defender? What efforts have you made? Have you just contacted this, Mr. Cain, today? Well, this isn't a Krankel situation. You're not raising the ad now. It's not a Krankel situation, but it's… What about the language in the Supreme Court cases, Segovia-Hanos and the other cases that, again, we're talking about an abuse of discretion here. And it's not an abuse of discretion to deny a continuance in the absence of ready counsel. And there clearly was no ready counsel here because the attorney said, give me two weeks and I'll file an appearance. Well, two responses. First, it's been held that there is an abuse of discretion when the trial court fails to conduct an inquiry into the circumstances and purpose of the defendant's motion. And that's from the people being on the case. And second, just the fact that he's asking for a continuance in and of itself is not a reason to deny the motion. It's not a reason to find that the attorney is not willing to enter his appearance. And that's from people being brisco in addition to… But if this was the first time he had changed attorneys, maybe it would be different. But as I said, this trial judge knew something about the past in this case. He had – did he change attorneys two or three times at a minimum? Yeah. And then the public defender got into the case. And now on this day – and he's not even there on time – on this day, he's representing that he has a name. Apparently the judge knew the name or the public defender knew the name, but there still wasn't an actual appearance filed. Yes. In terms of first addressing the prior attorneys, at first blush, that does sound like a pretty convincing, pretty damning argument from Mr. Ramsey. But looking at the actual facts of the case, there's two private attorneys. The first one files his appearance in bond court. And the next one comes in a few months later. When the public defender gets appointed to the case, this case has never been set for trial up to that point. It's not like previously he'd come in on the day of trial and asked for an attorney. There is this attorney, Galen, that does try to enter an appearance, but the court doesn't allow him to do so. And on that, that didn't even delay the trial because the public defender was never discharged. And that continuance was based on the court being in trial on another case. And, in fact, the continuance right before the trial was set and when it did go to trial was because the state's witness was unavailable. So no one seemed to be in this major hurry to get Mr. Ramsey tried until he tries to exercise his constitutional rights. But the matter was set for trial at one point in time. That's when the inconvenience occurred, or maybe not. But he said something, yeah, at that point, prior to that time, he'd said, I'm looking for my own attorney. And the court said, no, we're going forward. Now there's a scheduling conflict. It can't be handled that day. Now the defendant has time to look for another attorney, but he doesn't do it. We don't know exactly what the attorney, what the defendant was doing or wasn't doing. Well, he didn't bring in a new attorney. Let's put it that way. Even expressing his concern that he wants his own attorney, he wants to hire his own attorney. The next day, there's no, he has no attorney on board. He had, well, he does. And this is all, again, coming from the public defender. So these aren't just unsubstantiated statements from Mr. Ramsey. This is confirmed by a third party. But what the public defender said is that Mr. Cain was ready to come in without reservation and had established both the defendant's desire and ability to retain him. So this isn't the case. What do you mean without reservation? In two weeks. He said, but again, going back to Briscoe, just the continuance in and of itself. And I'm going back to the Supreme Court cases where if Mr. Cain appeared at trial and said, I'm your judge. He wants me. I'm filing my appearance. I'm ready for trial. And the judge said, oh, no, you're not following your appearance. We'll go with the public defendant. Then I understand your argument. But that's not what, Mr. Cain wasn't there. He wasn't ready to file an appearance. It's the day of trial. Witnesses are in the hallway. And Segoviano says, ready counsel. You have the right to counsel of your choice. But counsel has to be ready on the day of trial. I disagree with that last position. Because other courts have found an abuse of discretion when attorneys have tried to file an appearance on the day of trial. And if that's all it took, if just merely asking for continuance was enough to deny the defendant's right, then he really doesn't have right to counsel of choice. Because then you're forcing him to either decide between an unprepared attorney and an unwanted attorney. And, again, it must be shown that this is why the defendant's subjective intent is what's important. It's not the timing, the convenience to the court. All of those considerations are subservient to the defendant's constitutional right unless it's shown to be a dilatory tactic. And without the necessary inquiry here, the court just didn't have the facts to make that determination. I have one last inquiry for you. The issue about the extended term on the Class III. So here's my question. Is it ñ and the State has conceded that that was an error, given the posture of this case, the Class III being the lesser offense. So if we were to vacate the home invasion, what's the remedy to remand for a new sentencing hearing? I would, in that case, just leave the aggravated battery sentence as is because it could then be a ñ it could then be an extended term sentence because it would be the greatest, the highest level of offense. So the third issue is sort of an alternative to the first issue. Okay. And unless this Court has any further questions, Mr. Ramsey would request that this Court reverse his conviction for home invasion or remand his case for new trial. Thank you.  Ms. Schwinn. May it please the Court, Counsel, good morning. My name is Kristen Schwinn, and I represent the people in this matter. If it's okay with your honors, I would jump to the choice of counsel just as that was the issue that was last discussed. Justice Hutchinson, you are exactly right. This case had been set for trial at least five times before it actually went to trial. As early as January 28, 2014, the trial actually commenced on August 25, 2015. I believe, again, Justice Hutchinson, you mentioned at one time the case had been set for trial in July of 2014. At that time, about a week before the trial was to begin, an attorney, Ted Galen, had come in and attempted to file an appearance on behalf of the defendant. The defendant did not appear at that time, so the Court denied the attorney's request to file an appearance without the defendant present. At that point, Ted Galen had asked for a continuance for the trial. It is true, as opposing counsel said, the following week at that time, the case was continued both on the Court's motion for a scheduling conflict, but also because it was indicated that defendant wanted new counsel. So they set it for a month status date, and at that time, counsel was not retained, and the public defender continued on to have that representation. And that public defender continued to represent the defendant until the time of trial. The trial in question was set more than three months before the actual trial date. And in between the time it was set, in May of 2015, and the time that the trial began or was scheduled to begin for jury trial on August 24, there were two interim dates for pretrial proceedings and things of that nature. At no time did defendant ask for a new or indicate that he was unhappy or he was seeking new counsel. On August 24, when they appeared ready for jury trial, the defendant opted to go to a bench trial. It is true that there were no witnesses scheduled for that day, but that day was because it was set for picking a jury and opening statements. At that time, the defendant appeared ready with his public defender, executed a jury waiver, and, in fact, the people now crossed a number of counts in anticipation of the trial actually commencing. Then the day after the trial was supposed to begin, and, in fact, the day after the proceedings on the trial began, the defendant comes in with his counsel and requests for a new continuance in order for counsel to proceed. And I would disagree with the defendant's interpretation. I'm going to read from the record on page 159. Mr. Cain indicated that he would enter an appearance, but it was a conditioned appearance. The defense counsel says, you know, Mr. Cain has told me, obviously, he can't do a trial today. He also understands that it's unlikely, given the point that we are at, he would grant a continuance. But if he would, Mr. Cain would be willing to come back in two weeks and thereafter set an immediate trial date for the case and enter an appearance. This is directly contradictory to Savoglino, the Supreme Court case, where it says that counsel must be ready, willing, and able to enter an unconditional appearance. Mr. Cain's appearance was conditioned on his ability to obtain a continuance. Because it was a conditioned appearance, it was not an abuse of discretion for the court to deny the motion to continue. How many times during the course of these proceedings did the defendant fail to appear when he was otherwise expected to appear? Do we know that? Your Honor, I don't know off the top of my head. And I do know, I do recall at least one, at least one time. And that is apart from that July 24th, 2014 date where Mr. Galing came. Yes, I do recall at least one time, maybe two. I apologize, I don't know the specific number. Well, the point I'm going to add, now the question I'm asking does relate to that. He's looked for an attorney before. He has failed to appear at least on one occasion when this new attorney has come in and tried to file an appearance, well in anticipation of a trial date. And if there is at least one other date that he hasn't appeared, and on, in fact, the day of trial, I think he's appearing late. He shows up, but he just comes late. What more should a trial court do when looking to what the purpose of this continuance is? Should he just say, okay, fine, or should he say, look, the history here is pretty clear. You don't want to go to trial on this case. I do believe that, you know, in this instance, although the court did not hear from the defendant himself, he heard from defense counsel who advocated for the defendant in order for a motion to continue. And there's no indication in the record that defense counsel's advocacy was in direct conflict or a conflict of interest with the defendant. And I think the trial court's statements and the interaction between defense counsel and the state and the court allow the trial court to make a conscious decision to determine the facts necessary to determine whether or not it was going to grant the motion to continue or not. Cases talk about factors to consider, and I would disagree that whether or not it was a dilatory tactic was the sole reason. There's a number of factors. One, the court must balance whether the diligence of the movement, the right to a speedy, fair, and impartial trial in the interest of justice. And additionally, and in looking at those, courts have found that you look at five factors, which is the defendant's reason for new counsel, defendant's continuous custody, defendant's efforts to obtain new counsel, defendant's cooperation with the current counsel, and the length of time with the current counsel. When you look at all those factors, based on what was known to the court throughout the course of the proceedings, and in addition to what was told to the court during the motion, asking for the motion to continue, the court made a conscious decision and determined that there was not sufficient evidence to grant the motion to continue. In fact, the defendant, unlike several of the cases that the defendant cites in this brief, the defendant's been on bond throughout the duration of his case. He has shown that he has the ability and has, in fact, hired different counsels throughout the proceedings. I believe there were two counsels of record, plus the attempt by Ted Galen to make an appearance. It does not show anywhere in the record that the defendant has had any issues of cooperation with the current counsel that he had. And in fact, the current counsel had been of counsel for at least the past year and a half on that case. And so when you consider those factors, plus in the interest of justice, as which the court did cite, there were witnesses ready. They had anticipated going to trial the day before, but for the defendant's decision to go to a jury, or excuse me, decision to do a bench, they started the next day only because there was planning on both sides in order to which witnesses to call. And there are no other questions on choice of counsel. Please move on. I move on to reasonable doubt. May I take the phone? Yes. Okay. Thank you. I'd like to specifically address the argument that the defendant reached his hand out the back door to obtain these gardening tools. There is nothing in the record about reaching your hand out the back door to obtain the gardening tool. And in fact, Officer Tennyson testified that he took this photo about 30 minutes after the offense. And as you'll see, I do indicate that there is People's Exhibit 2, which was used at one point to stab the victim in the chest, or attempt to stab the victim in the chest, by the door. And that was put there by imprint by the defendant because he, after he broke it, he went outside, took a different tool, put that tool down, and returned back inside to continue to try to stab the victim. So there's nothing in the record that the defendant merely sticks his hand outside the door. What's in the record that he walked out the door and then totally legs it and totally came back in? Sure. I believe that the – I can get this back. I believe that there is – thank you. Sufficient evidence from the record that talks about that there was enough evidence to infer the defendant left, as the court found. What evidence, specifically? Sure. After the defendant and the victim had an altercation in the kitchen, the victim ran to his bedroom in order to obtain his cell phone to call 911. At that time, the defendant followed him and began to, I believe, throw him to the ground and then strangle him, causing the victim to drop his cell phone and press a whole bunch of numbers. The victim is able to get rid of – get the defendant off of him. The defendant leaves. During the time the defendant leaves and before he enters, returns to the kitchen, the victim is able to delete approximately 20 numbers from his phone to try to dial 911, leave the bedroom, walk back in from the bedroom into the kitchen, and right before – Did anyone ever ask him how much time elapsed? They did not ask him for the first instance. The second instance, while – after the defendant broke the targeting tool and came back, there was approximately three to four seconds between the defendant leaving the third time – or second time and then returning for that third time. And the people would argue that both of these instances alone would constitute an unlawful entry. But specifically, for the second one, there's a sufficient amount of time between erasing 20 numbers in a flip phone, leaving from the bedroom – A flip phone? Yes, it was a crooked flip phone. What year was this drawn? It was in 2015. Okay. And it was a crooked flip phone. So the amount of time shows that the person stepped outside a foot as opposed to reaching outside? I mean, that's really one of the inferences we're going to draw from a few seconds? I think it's a very reasonable inference that you can draw. Does it take so much longer to actually step outside than to reach outside? I think that the trier effect was able to draw a reasonable inference from the amount of time that the defendant left the bedroom and the victim attempted to erase the phone numbers, start to call 911, walk back down the bedroom – I'm sorry, walk back down the hallway into the kitchen to attempt to lock his apartment door before he comes back in. Do you agree that these tools were located in an area that someone could reach from not fully exiting the house? I believe that there is insufficient evidence – not enough evidence as to the arm's distance grasp as to where they were. Okay. So if there's insufficient evidence as to that, we're supposed to – Just assume? Assume for the state's benefit? No, I believe Mr. Stanley testified – Between the air conditioner and the door, and the handle of the door is on the side by the air conditioner, so it opens right to where the tools are, right there. Sure. And if you're looking at the chair, I mean, it's a normal person – it's the size a normal person could sit in. It's about the same width, so can you reach across the width of a chair? Yes or no? I don't know based on that photo. No, I mean, the problem with that photo is where the gardening tools left is where it was left by the defendant. Right, but my understanding as a testimony is the gardening tools were kept between the air conditioner and the door. Yes, that's correct. Again, that's a distance of about the width of a chair. Your Honor, if it is about the width of a chair, I don't have testimony on that. What I do believe is that it's not an unreasonable inference or an improbable or an unsatisfactory inference by the trial court based on the time and the actions that the victim had to take between the defendant leaving the victim's bedroom and the victim seeing the defendant come back into the kitchen, that that amount of time is not insufficient – excuse me, that that amount of time is a reasonable inference that the defendant left completely and returned just as the trial court said. Is that porch part of the dwelling? For purposes of the home invasion, it is not part of the dwelling. And I believe that it's not part of the dwelling because it's not part of Mr. Stanley's home. It's not part of his habitation. There was a number of – there was several statements in the testimony that the porch was considered – not the porch, excuse me, the laundry room was not considered by any means part of Stanley's home. He could not leave an umbrella there. He could not leave his muddy shoes there. If the victim in this case was the landlord who lived in the other apartment, would that have been part of the dwelling? I think we would – I think it would depend on the circumstances. I think that there is – in the particular facts of the case, I think part of the problem is with a multi-unit dwelling. Common areas are used by multiple people, but they might not be considered part of the home and the sanctity of the home. I believe the defendant cites to a number of residential burglary cases where they say multi-unit dwellings. I may continue. I believe in this court in Cunningham talks about a multi-unit parking structure where if you were to hold that – and this is purposes for the residential burglary, not home invasion. If the court were to hold that entry into a multi-unit parking dwelling was residential burglary, wouldn't it be residential burglary for the victim as well as all the other occupants of that multi-unit building? Which is why when we look at whether or not the habitation and the use of the actual enclosure or the area that we're talking about is to the victim, that would be the issue as to whether or not it's part of the dwelling here. And in here, in fact, there's a number of statements that Mr. Stanley could not use the laundry room for any purposes. In fact, there's some testimony that they discuss where they're talking about the exterior back door and not the defendant's – excuse me, the victim's kitchen door where he says if the exterior back door was locked, people couldn't come in. But if they were – if the exterior door was unlocked, you know, people – Can anyone ask him if he could lock it? I do not believe anyone – Again, insufficient evidence? If you need insufficient evidence of whether he had control over the lock of the – I believe that there's just not – Exterior door? I believe that there's not – I don't recall if there was evidence whether or not it was – I would believe that a dwelling is for human habitation. Mr. Stanley's not habitating in the laundry room. He's habitating in his apartment. Just as in an apartment building, people aren't habitating in hallways. They're habitating in the apartment. So – and if this attack had taken place in the laundry room, then it would simply have been a straightforward aggravated battery. Correct. That – that could be correct based on – based on that. It's one or the other, which is – So, I mean, if we accept your argument, henceforth, any type of attack that takes place in a common area, not suitable for habitation, not currently used for habitation, straightforward agbat. You know, I don't think it's necessarily straightforward agbat. I believe that there is – in this case – Well, I guess – I guess in this case probably it would be an aggravated battery. I know that there are cases in which people flee from their dwelling place and then they're actually – That didn't happen here. Right, but that – yeah. This same attack that takes place in the laundry room, it's a Class III period. It's no home invasion. I – based on – based on the facts in our – in our arguments, I would argue that I believe it might be difficulty saying that this is a dwelling for purpose. The laundry room would be a dwelling for purposes of this. Well, that's my point. Which is – I mean, you can't say, well, we could argue it this way if the facts were this way. Sure. These facts, which way does it go? Sure. Are you saying – I'm sorry. I didn't mean to cut you off. No, no. Then I'll stop with my question and you can answer. But if the attack takes place in the laundry room, henceforth you would be in a position, based on this opinion, to say this is not a dwelling, a common area, a vestibule, a foyer. Whether or not it's used, it's not part of a dwelling. It's an aggravated battery. I think for this specific victim, it would be an aggravated battery because he didn't have any use of the laundry room, apart from the fact that it's essentially an easement. Because he didn't have any – he doesn't have the ability to use the laundry room for any purposes, apart from entering the building. Now, if – I apologize. Go ahead. I don't have any answers. Go ahead. Now, for the landlord in this instance that used the laundry room, presumably for her clothes, that might be a different issue because there is – in this specific case, there are facts that that is her area that she is not using. Upstairs. Yes. Compared to an apartment building where there is a hallway with multiple units. Okay. But in this – I apologize. Okay.  Your time has expired. Yes. Do you want to summarize? Yes. Just for the reasons stated in our brief, we'd ask that the Court affirm. I do have one question. Sure. I asked counsel as well. Should we, for whatever reason, find that your argument failed on the dwelling, does the sentence stand then at seven years, extended term on the agbat, just stands as it is? I would argue yes. Okay. Because that would be the highest felony then that he was publicly convicted. Thank you. Okay. Thank you. Mr. McCord. Just two points on the counsel of choice argument. This is to follow up on Justice Burke's question that I was asked at the end of my initial argument. If you read just the one sentence from Citavano about a ready and willing attorney, that would seem not to apply here because, yes, Mr. Cain was not in court and he asked for a continuance. However, if you look at the case law and how it's interpreted, and especially how it's interpreted when there is a failure to inquire, the fact that he's not in court and the fact that he's not – the fact that he's making a continuance is not enough to deny the motion. In People v. Childress, the attorney was in court. He was not ready to go to trial. The appellate court held that that was an abuse of discretion to deny the defendant's motion. In People v. Balsar, Bassler, People v. Bingham, People v. Tucker, all those cases, the attorney is not in court, but the trial judge did not make the proper inquiry, so the appellate courts reversed and found there to be an abuse of discretion. In fact, in People v. Adams, the new attorney was not even identified, but the failure to inquire by itself was sufficient grounds for reversal. And so the second point, to follow up on what Justice Hutchinson asked the opposing counsel, what more did the trial court need to do? He needed to ask questions such as – these questions probably should have been directed to the defendant. Why do you want another attorney? What is your disagreement with the public defender? Has this disagreement just recently come up? What have you been doing to try to attain a new attorney? What have you been doing? What is your financial circumstances? Questions like that because, as the court said in People v. Bassler, the balancing of instruments necessitates review of the defendant's diligence and inquiry into her reasons for making the request to determine if the defendant was truthful or merely attempting to delay the case. So that type of inquiry was what was needed here. It was not done and, in fact, the court said it didn't matter if it was a dilatory tactic or not. So for those reasons – You use the term – or let's put it this way. When we use the term it's the 11th hour, that's usually not complementary. And so he says we're at 59 minutes past the 11th hour. He – I mean, that sounds like he is making that finding based upon the record and his experience in this case. So what more does – they don't have to have a disagreement. There doesn't have to be a conflict between the public defender and the defendant. So what's the purpose in asking that question? The purpose in asking is finding out the defendant's subjective intent. And, yes, he did say it was 59 minutes past the 11th hour, but that merely goes to the timing of the request. It doesn't go to the reasons behind it. And you need to know the reasons behind it to understand if it was used to delay trial. And, in fact, if you read both the court's comments saying whether or not it's a dilatory tactic and then later on saying regardless of what the defendant's subjective intent is, he was going to categorically deny this motion. So that is why he needed to make an inquiry here. And, again, Mr. Ramsey would just ask that this court reverse his home invasion conviction or remand his case for new trial. Thank you. Thank you for your argument this morning. We will consider the matter and take it under adjustment. We will stand in a court recess to prepare for our next hearing.